IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BOB WEBER'S, INC., an Oregon
Corporation; MARSHA WEBER, an
individual; and MATHEW WEBER,
an individual;

                Plaintiffs,

     v.

PACWEST ENERGY, LLC, a
Delaware limited liability company;

                Defendant.

No. 3:15-cv-00794-SB

OPINION & ORDER

Craig R. Berne
Roger K. Harris
HARRIS BERNE CHRISTENSEN, LLP
5000 S.W. Meadows Road, Suite 400
Lake Oswego, OR 97035

      Attorneys for Plaintiffs

John A. Schwimmer
Darin D. Honn
Dan Christopher Burdett
SUSSMAN SHANK, LLP
1000 SW Broadway, Suite 1400
Portland, OR 97205

      Attorneys for Defendant

1 – OPINION & ORDER

HERNÁNDEZ, District Judge:

Plaintiffs Bob Weber's, Inc. ("BWI"), Marsha Weber, and Mathew Weber, (collectively, "Plaintiffs"), bring this action against Defendant PacWest Energy, LLC ("PacWest"). The parties' dispute centers on the impact of the death of Robert ("Bob") Weber on franchise agreements between PacWest and "Bob Weber Inc./Robert J. Weber." The agreements provided for the lease of property and supply of gasoline to a gas station operated by Bob Weber, who died in January of 2015. Bob Weber was Marsha Weber's husband and Mathew Weber's father.

PacWest seeks to terminate the franchise agreements and take possession of the gas station. Plaintiffs contend that PacWest has violated Plaintiffs' rights under the franchise agreements, the Oregon Motor Fuels Franchise Act, ORS 650.200, et seq.; and the federal Petroleum Marketing Practices Act, 15 U.S.C. § 2801, et seq. According to Plaintiffs, PacWest was required to allow BWI and Mathew or Marsha to continue running the franchise after Bob Weber passed away.

Now before the Court is Plaintiffs' Motion for Preliminary Injunction. Plaintiffs ask this Court to enjoin PacWest from terminating the agreements and taking possession of the gas station. The Court heard evidence and oral argument on June 26 and June 29, 2015. Because Plaintiffs fail to demonstrate a likelihood of success on the merits, the motion for preliminary injunction is denied.

## BACKGROUND

Bob Weber operated a gas station franchise in Portland, Oregon (hereinafter, the "Gas Station"). Compl. ¶ 4. BWI is a closely-held corporation whose primary asset is a franchise relationship with PacWest and the operation of the Gas Station. McNeese Decl. ¶ 4. PacWest

owns the real property upon which the Gas Station is located and owns the local franchisor rights for branding and delivering fuel to the Gas Station franchisee. Compl. ¶ 5.

Prior to 2002, Bob Weber owned all the shares of stock of BWI. On May 16, 2002, Bob Weber transferred all shares to "Robert J. Weber, Trustee (or any successor Trustee) of the Robert J. Weber Trust under agreement dated May 16, 2002 as amended." Id. Since 2010, the successor trustee of the Robert J. Weber Trust ("the Trust") has been John McNeese, estate planning attorney for Bob Weber. Id. Between 2010 and January 2015, Bob Weber served as the President of BWI. Compl. ¶ 6.

In 2010, PacWest and "Bob Weber Inc./Robert J. Weber" entered into two agreements, a Retail Facility Lease and a Retail Sales Agreement, that together constitute the "Franchise Agreements." Id. at ¶ 4; Mathew Weber Decl. Ex. A (hereinafter, "Lease"); Mathew Weber Decl. Ex. B (hereinafter, "RSA"). The initial franchise term was July 1, 2010 through June 30, 2015. Id. at ¶ 5; Lease; RSA. Both the Lease and the RSA allowed the Lessee/Retailer the unrestricted right to renew the Franchise on specified terms for a second five-year period through June 30, 2020. Id.

On January 23, 2015, Bob Weber unexpectedly passed away. On February 3, 2015, PacWest provided a "Notification of Termination of Franchise Relationship and Tenancy" to Marsha Weber and the attorney for Bob Weber's estate. Mathew Weber Decl. Ex. E, at 1. PacWest's Notification stated that Bob Weber's death was a "terminating event" according to the terms of the Lease and the RSA and that PacWest would not enter into a new lease or supply agreement. Id.

On February 6, 2015, Mr. McNeese, the successor trustee of the Trust and the "Sole Director" of BWI, appointed Marsha Weber as President and Secretary of BWI and Mathew Weber as Vice President and General Manager of BWI. Mathew Weber Decl. Ex. G.

On February 9, 2015, Marsha Weber and Mathew Weber provided a "Notice of Designee's Intention to Succeed to the Franchise Agreement" to in-house counsel for PacWest. Mathew Weber Decl. Ex. F. Pursuant to Section 25 of the RSA, Marsha and Mathew gave notice of their interest to succeed to the interest of Bob Weber and invoked "all rights and remedies under ORS 650.225 and the federal Petroleum Marketing Practices Act." Id.

On February 26, 2015, the attorney for BWI and Bob Weber's estate sent a letter, "Exercise of Lease Extension Option," to PacWest, exercising the lessee's right to a five-year extension of the Lease. Mathew Weber Decl. Ex. H.

PacWest refused to honor the February 26, 2015 extension of the Lease, recognize Mathew or Marsha as the successor designee, or enter into a new Lease and RSA with BWI and Mathew or Marsha. PacWest contends that it has the right to take control and possession of the Franchise and the Gas Station. In response, Plaintiffs filed the present motion for a preliminary injunction.

## STANDARDS

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The plaintiff "must establish that irreparable harm is likely, not just possible[.]" Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original). The court may apply a sliding scale test,

under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." Id.

Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four required elements set forth above. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam); Lopez v. Brewer, 680 F.3d 1068, 1072 (9th Cir. 2012) (a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion") (quoting Mazurek, 520 U.S. at 972) (emphasis in original).

## DISCUSSION

The Court denies Plaintiffs' motion for preliminary injunction because Plaintiffs fail to show a likelihood of success on the merits. Mathew Weber was not properly designated as a successor to Bob Weber and Marsha Weber is not qualified, as defined by Oregon statute, to assume operations of the Franchise. Therefore, PacWest is within its rights to take control and possession of the Franchise.

## I.    Claims in the Complaint

Plaintiffs bring six claims against PacWest. See Compl. First, Plaintiffs seek the following declaratory judgment pursuant to ORS 28.020:

> PacWest may not terminate the Franchise agreements and take possession and control of the Gas Station and the Franchise on May 7, 2015[1], but instead, has an obligation to honor the extension of those agreements and recognize Mathew or Marsha as the successor Designee, or enter into new Lease and RSA agreements with BWI and Mathew or Marsha.

---

[1] PacWest initially told Plaintiffs that it would take possession and control of the Gas Station on May 7, 2015. Mathew Weber Decl. Ex. E, at 1. However, in order to avoid temporary restraining order proceedings, the parties agreed that PacWest would refrain from taking any action until the earlier of June 30, 2015, or this Court's decision on Plaintiff's request for a preliminary injunction. Pl.'s Mot. 8. At oral argument, PacWest agreed not to proceed with any action against Plaintiffs until this Opinion is issued.

Compl. ¶ 41(1). Second, Plaintiffs seek specific performance of the Lease and the RSA by requiring PacWest to recognize the extension of the Franchise through at least June 30, 2020 with BWI and Mathew or Marsha as the Lessee/Retailer, or by requiring PacWest to enter into new franchise agreements with BWI and Mathew or Marsha on terms and conditions as required by statute. Compl. ¶ 23. Plaintiffs' third, fourth, and fifth claims allege that PacWest's refusal to honor the extension of the Franchise agreements and/or enter into new Franchise agreements violated the RSA and the Lease, the Oregon Motor Fuels Franchise Act ("OMFFA"), and the Petroleum Marketing Practices Act ("PMPA"), respectively. Finally, Plaintiffs bring a sixth claim of intentional interference with prospective business relations.[2]

## II.    Likelihood of Success on the Merits

Plaintiffs argue that PacWest has contractual and statutory duties to honor BWI's and Mathew's or Marsha's rights to operate the Franchise and possess the Gas Station at least through June 30, 2020. Plaintiffs contend that PacWest's termination of the Franchise and threat to take possession of the Gas Station is a breach of contract and a violation of the OMFFA and PMPA. The Court finds that Plaintiffs fail to demonstrate a likelihood of success on the merits.

### A.  Breach of the Franchise Agreements

Plaintiffs argue that PacWest's effort to take control of the Franchise constitutes a breach of contract because Bob Weber's death was not a "terminating event" under the Franchise Agreements and, even if it was, Mathew Weber was designated and qualified to be Bob Weber's successor in interest. The Court finds that Bob Weber's death was a terminating event and that Mathew Weber was never properly designated as Bob Weber's successor. Accordingly, it is

---

[2] PacWest has filed a motion to dismiss Plaintiffs' sixth claim, which is pending before Magistrate Judge Beckerman. The parties do not discuss Plaintiffs' sixth claim in this dispute regarding a preliminary injunction.

unnecessary to reach the issue of whether Mathew was qualified to assume operation of the
Franchise.

                  i.    Terminating event

The parties dispute whether Bob Weber's death provided proper grounds for PacWest to
terminate the Franchise Agreements. The Lease was executed between PacWest as Lessor and
"Bob Weber Inc./Robert J. Weber" as Lessee. Lease at 1. The RSA was executed between
PacWest as Seller and "Bob Weber Inc./Robert J. Weber" as Retailer. RSA at 1. Section 18 of
the Lease provides that the Lessor (PacWest) may terminate the Lease if one of several
termination events occurs, including:

> Subject to Lessee's successor in interest rights under the RSA, Lessee's death if Lessee is
> an individual, or if Lessee is a partnership or corporation, <u>the death of any individual who
> is currently in "control" of the ownership interest of Lessee</u> ("control" being the authority
> to direct the operations of Lessee and to have or exercise management responsibility).

Lease at ¶ 18(a)(3)(xii) (emphasis added).[3] Both the Lease and the RSA identify Bob Weber as
the "Key Management Person" who will "exercise primary management responsibility for
[Lessee/Retailer's] day-to-day operations." Lease at ¶ 23(b); RSA at 23.

The parties argue that there was no terminating event, notwithstanding Bob Weber's death.
The issue is whether Bob Weber was the individual "currently in 'control' of the ownership
interest" of Lessee "Bob Weber Inc./Robert J. Weber." According to Plaintiffs, the
"individual . . . currently in 'control' of the ownership interest" of BWI was the Trust. Plaintiffs
argue that there was no death of this "individual" because the Trust is still in existence and Mr.
McNeese, successor trustee of the Trust, is still alive. To the extent that the term "individual"
does not account for a situation where a corporate entity controls the ownership interest,

---

[3] The RSA contains a virtually identical provision. RSA at 20-21. For the sake of clarity, the Court
conducts its analysis using the terms Lease and Lessee, although the analysis applies identically to the
RSA and Retailer.

Plaintiffs fault PacWest as drafters of the Agreements. Plaintiffs assign no significance to the designation of Bob Weber as the "Key Management Person," because the termination provision does not specify that the "Key Management Person" was necessarily the same person as the individual in control of the ownership interest.

However, Plaintiffs' interpretation cannot be squared with the plain language of the Lease. First, the Lease clearly states that the death of an <u>individual</u> currently in control of the ownership interest of Lessee is a terminating event. The Lease then defines "control" as "the authority to direct the operations of Lessee and to have or exercise management responsibility." Plaintiffs do not dispute that Bob Weber, and Bob Weber alone, was the person with that authority and responsibility. The Court fails to see how a Trust could be in control, as defined by the Lease.

Furthermore, even if the Trust were in control, Bob Weber was the Trustee until his death. Therefore, his death as Trustee was a terminating event. Plaintiffs' construction of the Agreements is problematic because it could create a "permanent estate of inheritance in the franchise." <u>See</u> <u>Kostantas v. Exxon Company, USA</u>, 663 F.2d 605, 606 (5th Cir. 1981). In other words, if the successor trustee to the Trust could be the "individual in 'control,'" then no person's death that could ever be a terminating event so long as there was a named successor trustee. Accordingly, Bob Weber's death must have been a terminating event under the Agreements.

ii.    Successor in interest

Even though Bob Weber's death was a terminating event, PacWest could only terminate the Lease and the RSA "subject to Lessee's successor in interest rights under the RSA." Lease ¶

18 (a)(3)(xii). Plaintiffs contend that Mathew Weber was designated as Bob Weber's successor in interest and that, therefore, termination was improper.

> The RSA provides that:
>
> Retailer may designate, in writing, a surviving spouse, adult child, stepchild, brother or sister, or parent of Retailer ("Designee") for Seller to consider accepting as a new franchisee in the event of Retailer's death[.]

RSA at 22. However, neither the RSA nor the Lease designate, in writing, a Designee for PacWest to accept as a new franchisee in the event of Bob Weber's death. Instead, the RSA states:

> Retailer designates as successor in interest under this Agreement and any related agreements constituting the franchise between Seller and Retailer (collectively, the "Franchise Agreement") ___Bob Weber Inc./ Robert J. Weber____ [spouse, adult child or stepchild, or guardian of the Retailer's child or stepchild] ("Designee") . . . Designee shall have thirty (30) days after Retailer's death to give Seller written notice of Designee's intention to succeed to the Franchise Agreement.

RSA at 23. In other words, "Bob Weber Inc./Robert J. Weber," as the Retailer, designated itself as the Designee.

Plaintiffs contend that this designation does not make sense and that, clearly, the parties must have understood in 2010 that the Designee would be a "spouse, adult child or step child, or guardian of [Bob Weber's] child or stepchild," not BWI nor Bob Weber himself. Plaintiffs argue that Bob Weber's failure to designate a successor must have been a mistake and that this Court should exercise its equitable powers to reform the Agreements and designate Mathew as the successor. Plaintiffs contend that either it was a mutual mistake, where both parties intended but failed to designate Mathew, or a unilateral mistake, where PacWest intentionally failed to designate Mathew in order to deprive Bob of his statutory successor rights.

As an initial matter, the Court notes that Plaintiffs raised this argument for the first time in their Reply brief. At no point prior to Bob Weber's death did Bob, Mathew, Marsha, or any of their representatives communicate to PacWest that there was an error in the successor provisions of the 2010 Agreements. Nor did any of Plaintiffs or their representatives communicate this to PacWest after Bob Weber's death. Furthermore, Plaintiffs' opening brief in support of this motion made no mention of a "mistake" argument.[4]

Even assuming *arguendo* that Plaintiffs timely raised their "mistake" arguments, they fail because Plaintiffs did not present evidence showing that Bob Weber intended to designate Mathew as his successor in the 2010 Agreements and that PacWest was aware of Bob's intention.

Plaintiffs present the following evidence to demonstrate Bob Weber's intent. In 2012, Bob Weber communicated through his attorney, Christian Oelke, with PacWest about having the shares in BWI sold or transferred to Mathew. Mathew Weber Decl. ¶¶ 7-8 and Ex. D. Bob and Mathew traveled to PacWest's headquarters Idaho in 2012 to discuss acquiring the Gas Station property and/or constructing a convenience store at the Gas Station. Supp. Decl. Mathew Weber Decl. ¶ 2. Former PacWest employee Jeff Jackson[5] testified that he understood, through conversations with Bob Weber in 2012, that Bob intended for Mathew to take over the Gas Station.

---

[4] Plaintiffs instead argued that a February 9, 2015 notice from Mathew and Marsha to PacWest properly designated Mathew as the successor Designee. However, the February 9 notice was sent after Bob Weber died and six days after PacWest had already given notice that Bob Weber's death was a terminating event. Id. Mathew Weber Decl. Ex. E. Furthermore, the notice was signed by both Mathew Weber and Marsha Weber and did not name either one specifically as the Designee. Mathew Weber Decl. Ex. F. Therefore, Plaintiffs' argument is unavailing.

[5] In late 2011 and early 2012, Jeff Jackson was Vice President of Real Estate for Jackson Oil, a division of Jackson Food Stores, Inc., the corporate manager and a member of PacWest. Jackson Decl. ¶ 2.

Notably, all of the evidence that Plaintiffs present is from 2012, yet the Agreements were signed in 2010. Plaintiffs fail to present any evidence that demonstrates Bob Weber's intent before or at the time the Agreements were signed. Furthermore, the 2012 evidence does not establish that Bob Weber intended to designate Mathew as his successor. All of the communications between Bob Weber, Christian Oelke, and PacWest centered on the potential transfer of stock to Mathew and the construction and financing of a convenience store. Nothing in the 2012 communications demonstrates Bob Weber's intent to designate Mathew as his successor in the 2010 agreement.

Furthermore, even if this Court agreed as a matter of common sense that Bob Weber probably did not intend to designate himself as the successor, Plaintiffs nevertheless fail to persuade the Court that reformation is appropriate or even permissible. At oral argument, Plaintiffs' counsel repeatedly cited an Oregon Court of Appeals case for the proposition that a Court may reform a contract that contains an error due to a unilateral mistake. See Pioneer Res., LLC v. D.R. Johnson Lumber Co., 187 Or. App. 341, 68 P.3d 233 (2003). However, Pioneer Resources makes clear that "[r]eformation is available . . . only where there exists an agreement that preceded the writing." Id. at 373. While the antecedent agreement does not necessarily need to be binding or in writing, there must be sufficient proof of an agreement that predated the writing that the moving party seeks to reform. Id. at 367-68. Here, Plaintiffs offer no evidence of any agreement that predated the execution of the 2010 Agreements.

Similarly, the Court does not find sufficient evidence of a mutual mistake by the parties in order to support reformation. The Oregon Court of Appeals has explained that a court may reform a contract in the event of a mutual mistake of fact or law, or a mistake of one party and fraud on the part of another party. Taylor v. McCollom, 153 Or. App. 670, 684, 958 P.2d 207,

215 (1998) (citations omitted). However, as with a unilateral mistake, "[t]he requisite elements for reformation of a contract are a prior agreement and a subsequent writing which by mutual mistake varies from the prior agreement." <u>Kotan v. Sch. Dist. No. 110C</u>, 13 Or. App. 139, 145, 509 P.2d 452, 455 (1973). Because Plaintiffs fail to present evidence of a prior agreement, the Court is unable to conclude that either party made a mistake in failing to designate Mathew as the successor to Bob Weber.

In sum, Bob Weber's death was a terminating event under the Lease and the RSA, and Mathew was not properly designated as the successor in interest. Accordingly, PacWest was entitled to terminate the Agreements rather than continue the business relationship with BWI, Mathew, or Marsha. Plaintiffs do not demonstrate a likelihood of success on their breach of contract claim.

### B. Oregon Motor Fuels Franchise Act (OMFFA)

Plaintiffs next argue that, even if their breach of contract claim lacks merit, the OMFFA imposes on PacWest a duty to enter into new Franchise Agreements with Mathew or Marsha. The Court disagrees because Mathew was not properly designated as a successor and Martha is not qualified to be a franchisee.

ORS 650.225 states:

(1) Following the death of a motor fuel retailer franchisee and notwithstanding the terms of the franchise, the franchisor, in the case of leased marketing premises, shall enter into a new franchise with the designee of the motor fuel retailer franchisee on the terms and conditions then generally being extended by the franchisor to similarly situated motor fuel retailers if:

(a) Prior to the death of a motor fuel retailer franchisee, the motor fuel retailer franchisee <u>notifies the franchisor in writing of the designee</u>, who shall be the surviving spouse, adult child, or adult stepchild of the motor fuel retailer franchisee or <u>in the absence of a designation, the motor fuel retailer franchisees surviving spouse</u>, if any;

(b) At the time of the motor fuel retailer franchisees death, <u>the designee meets the qualifications then being required by the franchisor for its motor fuel retailer franchisees</u>; and

(c) Within 10 days following the motor fuel retailer franchisees death, the designee enters into a new franchise with the franchisor on the terms and conditions then generally being extended by the franchisor to similarly situated motor fuel retailer franchisees, except that for the part of the term of the new lease equal to the unexpired portion of decedent franchisees prior lease, the rent shall be the same as under the prior lease.

(Emphasis added).

Plaintiffs argue that, in accordance with ORS 650.225(a), Bob Weber notified PacWest that Mathew Weber was his designee. Plaintiffs submit an email exchange from 2012 between Mr. Oelke, estate-planning lawyer for Bob Weber, and Richard Johnson, attorney for PacWest. Mathew Weber Decl. Ex. D. The communications related to a request by Bob Weber that PacWest waive its right of first refusal to allow a future transfer of BWI stock to Mathew. <u>Id.</u> However, the emails have nothing to do with the provision in the RSA concerning designation of a successor in interest nor do they reference any change in the operational or management control of the Gas Station. Furthermore, nothing ever resulted from this email exchange. No stock was transferred. PacWest merely agreed to waive its first right of refusal if Bob Weber had decided in the future to transfer to Mathew some or all of the BWI stock. Accordingly, Plaintiffs fail to present any evidence that could suffice to satisfy the requirement of a written notification designating Mathew Weber to succeed Bob Weber.

As to Marsha Weber, the OMFFA provides that she is a designee by default, but only if at the time of Bob Weber's death she met "the qualifications then being required by the franchisor for its motor fuel franchisees." <u>See</u> ORS 650.225(1)(b). The parties disagree about PacWest's requirements for its motor fuel franchisees in January of 2015 and whether Marsha meets those requirements.

13 – OPINION & ORDER

Marsha Weber had a limited role in the operation of the Gas Station. She was married to Bob Weber for 52 years and he was a gas station owner during that entire time. Marsha was the secretary of BWI and managed the books for BWI. Compl. ¶ 6. She testified that she made all of the bank deposits for Bob, she helped him organize his records, and she would take care of the business when Bob was out of town. Marsha testified that Bob was away for approximately 5-7 days, 2-3 times a year. During those days, Marsha would check on the Gas Station twice a day. She also testified that she fired Gas Station employees on behalf of Bob because he did not like doing it himself. Marsha worked for decades as a librarian in the Multnomah County Central Library, where she hired, fired, and trained employees. Id. ¶ 15. Marsha also managed a hotel and rental properties. Id. ¶ 17.

Marsha testified that she asked Mathew to run the Gas Station after Bob passed away. In addition, Mathew stated that Marsha would keep Mathew "as General Manager to operate the Franchise and enter into new Franchise agreements with PacWest in the event that she is by default the designee." Id. ¶ 12. Marsha testified that she had not received any formal training to run the Gas Station, but that she had absorbed knowledge through informal training by virtue of being married to Bob.

Plaintiffs argue that Marsha meets the qualifications to run a PacWest franchise. Plaintiffs submit the declaration of Roger Harris, one of Plaintiffs' attorneys who has extensive experience representing gasoline dealers, franchisees, and petroleum-related businesses. Mr. Harris declares that over the past ten years, he has become familiar with "several individuals to whom [PacWest] has granted franchises" and that Marsha is "at least as well-qualified as those operators that PacWest Energy, LLC previously approved." Harris Decl. 3. In addition, Gabe Dunaway, a former gas station owner, testified on Plaintiffs' behalf. Mr. Dunaway testified that

he knew of two people who had been approved to operate a PacWest gas station franchise, despite having no previous experience running a gas station.

PacWest contends that Marsha has no experience relevant to operating a gas station and that, therefore, she does not meet the PacWest requirements for a franchisee. PacWest submits the declaration of Joe Sacomano, territory manager for Jackson Oil, a division of Jacksons Food Stores, Inc., the corporate manager and a member of PacWest for the states of Oregon and Washington. Mr. Sacomano states that "in evaluating the qualifications of candidates for lessees/retailers of PacWest, I generally look for operators who have existing sites and the ability to take on an additional location or who have significant experience operating gas stations successfully." Sacomano Decl. ¶ 4.

In addition, Marsha appears to have had no contact with any representatives of PacWest. PacWest submits the declaration of Joe Sacomano and Susan Evancho, accounts receivable manager at PacWest, to demonstrate that Marsha never had any contact with key PacWest employees. Sacomano Decl.; Evancho Decl.

In addition, PacWest called Jeff Jackson. Mr. Jackson's testimony established that PacWest does not have a written list of qualifications under which they evaluate potential franchisees. Mr. Jackson explained that the PacWest board evaluates each potential candidate. Mr. Jackson could not recall any instance where PacWest approved a franchisee who had not previously operated a gas station.

Robert Teffeteller, General Counsel for Jackson Oil and PacWest, also testified on behalf of PacWest. Mr. Teffeteller acknowledged at least one instance where a person without prior experience running a gas station was granted a franchise. However, Mr. Teffeteller testified that this person did not run the franchise successfully and sold it within two years. According to Mr.

Teffeteller, PacWest learned from this experience and instituted stricter standards for individuals to qualify as franchisees. Mr. Teffeteller testified that, in the last two years, PacWest has agreed to give leases to gas station operators in approximately 8-10 retail sites and that every one of the assignees receiving leases had prior experience owning or operating gas stations. Accordingly, Mr. Teffeteller testified that Marsha did not meet the current required qualifications to be a PacWest franchisee.

The Court agrees with PacWest that Marsha Weber is not qualified, as defined by the OMFFA, to be the Designee. The OMFFA requires the Designee to meet the qualifications required by franchisor. PacWest presents unrefuted evidence that, at least for the past two years, PacWest has required franchisees to have prior experience owning or operating a gas station. Plaintiffs fail to persuade the Court that Marsha's limited involvement with the Gas Station is enough to meet PacWest's requirements.

In addition, Marsha's willingness to hire Mathew as the General Manager of the Gas Station cannot form the basis for this Court to find that Marsha is qualified as defined by the OMFFA. The OMFFA clearly requires the Designee herself to meet the qualifications imposed by the franchisor. If Marsha could meet the requirements simply by hiring a qualified person, then there would never be an unqualified Designee.[6] Such an interpretation does not make sense.

PacWest has considerable discretion to determine the criteria for a "qualified" franchisee. Accordingly, PacWest was entitled to exercise its discretion and determine that franchisees must have prior experience operating a gas station in order to be qualified.

---

[6] The Court expresses no opinion as to whether Mathew would have been qualified to be a Designee.

Because Mathew was not properly designated to succeed Bob Weber and because Marsha is not qualified to be the Designee, Plaintiffs fail to show a likelihood of success on their OMFFA claim.

### C. Petroleum Marketing Practices Act (PMPA)

Plaintiffs argue that the PMPA prohibits termination or nonrenewal of the Franchise except upon specified terms, none of which apply to this case. PacWest argues that it may terminate the Franchise pursuant to 15 U.S.C. §2802(b)(2)(c), which states that a franchisor may terminate any franchise if such termination is based upon "the occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable[.]"

PacWest cites several federal court cases for the proposition that the death of a franchisee may constitute a "relevant event" that authorizes termination of the franchise. The Fifth Circuit Court of Appeals explained that terminating a franchise agreement due to the death of the franchisee was neither forbidden nor inconsistent with the PMPA. Kostantas v. Exxon Co., U.S.A., 663 F.2d 605 (5th Cir. 1981). The Court stated:

> The PMPA seeks to prevent abusive trade practices by franchisors, recognizing the disparity of bargaining power between the franchisors and the franchisees. The Act was not designed to create what is tantamount to a permanent estate in the franchise relationship. For these reasons, we conclude that the Act does not prohibit a contractual provision providing for termination upon the death of a franchisee.

Id. at 606. Other district courts have concurred. See, e.g., Ayers v. Marathon Ashland Petroleum LLC, No. 103-CV-1780-RLY-TAB, 2007 WL 3171445, at *2 (S.D. Ind. Oct. 26, 2007) ("[F]ederal courts have ruled that the PMPA does not prohibit a contractual provision in a franchise agreement that terminates the agreement upon the franchisee's death."); Iannuzzi v. Exxon Co., U.S.A., Div. of Exxon Corp., 572 F. Supp. 716, 721 (D.N.J. 1983) ("This court

agrees that a franchise may be terminated upon the death of the franchisee without violating the PMPA.").

Plaintiffs counter that these cases merely stand for the proposition that the death of a franchisee may meet the definition of a relevant event justifying termination, not that the death of a franchisee is a relevant event in all instances. Plaintiffs contend that the present case is distinguishable because, after the Court reforms the Agreements, then the Agreements do not unambiguously and clearly provide for termination of the franchise upon Bob Weber's death.

Therefore, the resolution of this claim hinges upon the outcome of the breach of contract claim. As this Court explained above, the Court declines to reform the Agreements. Because Bob Weber's death was a terminating event, nothing in the PMPA prevents PacWest from terminating the franchise. Accordingly, Plaintiffs fail to show a likelihood of success on their PMPA claim.

The Court acknowledges that the burden for a franchisee seeking a preliminary injunction under the PMPA is lower than the burden for a preliminary injunction in other settings. See Khorenian v. Union Oil Co. of California, 761 F.2d 533, 535 (9th Cir. 1985) ("The test for the issuance of a preliminary injunction under the PMPA is more liberal than that in the general run of cases."). However, Plaintiffs must still make a showing that there are "sufficiently serious questions going to the merits" that present "a fair ground for litigation." 15 U.S.C. § 2805(b)(2); see also Mac's Shell Serv., Inc. v. Shell Oil Products Co. LLC, 559 U.S. 175, 179, 130 S. Ct. 1251, 1255 (2010); Hilo v. Exxon Corp., 997 F.2d 641, 643 (9th Cir. 1993). Plaintiffs fail to meet this burden.

///

18 – OPINION & ORDER

III.    **The Remaining Three Factors**

Ordinarily, monetary harm does not constitute irreparable harm. E.g., Goldie's Bookstore, Inc. v. Superior Court, 739 F.2d 466, 471 (9th Cir. 1984) ("Mere financial injury ... will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation."); L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1202 (9th Cir. 1980) ("[M]onetary injury is not normally considered irreparable."). However, the threatened destruction of a business may be sufficient to satisfy the requirement that a movant show a "likelihood of irreparable injury." See Dollar Rent A Car, 774 F.2d at 1375; see also Hughes Network Systems, Inc. v. InterDigital Communications Corp., 17 F.3d 691, 694 (4th Cir. 1994) (in remanding for further consideration, court noted that even if loss can be compensated by money damages, extraordinary circumstances may give rise to irreparable harm required for preliminary injunction); but see Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801–802 (3d Cir. 1989) (harm was not deemed irreparable even though nature of action involved loss of majority of business revenue).

Plaintiffs can establish irreparable harm. If PacWest is not enjoined, it plans to terminate the Franchise and take possession of the Gas Station. Furthermore, Mathew Weber declared and PacWest did not deny that "PacWest has stated that, once it re-takes and assumes control, it will close and tear-down the Gas Station before rebuilding and re-opening it in a new convenience store and fuel-dispensing configuration with its affiliate, Jackson Oil Company, running the operation." Mathew Weber Decl. ¶ 9. Accordingly, this factor weighs in favor of Plaintiffs.

Plaintiffs also prevail as to balancing the equities. In considering a motion for a preliminary injunction, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co.

v. Vill. of Gambell, AK, 480 U.S. 531, 542 (1987); see also Univ. of Hawai'i Prof'l Assembly v.

Cayetano, 183 F.3d 1096, 1108 (9th Cir. 1999) ("To determine which way the balance of the

hardships tips, a court must identify the possible harm caused by the preliminary injunction

against the possibility of harm caused by not issuing it."). PacWest argues that a preliminary

injunction would force it to engage in ongoing business with people it never selected and who

are not qualified to run the Gas Station, thereby adversely affecting the good will and value

attendant to the Gas Station location. Plaintiffs argue that the balance of the equities favors them

because PacWest stands to lose nothing or very little through the issuance of an injunction,

whereas Plaintiffs could lose their family business and livelihood. In addition, Plaintiffs argue

that nothing in the injunction would change the status quo that existed before Bob Weber's

death. The Court finds that this factor tips in favor of Plaintiffs.

Finally, the public interest factor favors Plaintiffs. Plaintiffs argue that the OMFFA and

the PMPA are intended to protect small, closely-held businesses from the predatory acts of large

oil companies due to their unequal economic bargaining position. Plaintiffs argue that a

preliminary injunction would protect them while discouraging improper and unlawful motor fuel

franchise terminations. Plaintiffs cite legislative history from both the OMFFA and the PMPA,

showing that there is a public policy interest in protecting a franchisee's reasonable expectations

of continuation in the franchise. This interest was explained by the Ninth Circuit in Hilo v.

Exxon Corp.:

> Our general approach to the construction and application of the PMPA is well
> established. As we recently observed, "the overriding purpose of Title I of the PMPA is
> to protect the franchisee's reasonable expectation of continuing the franchise
> relationship." Ellis v. Mobil Oil, 969 F.2d 784, 788 (9th Cir. 1992) (quoting Slatky v.
> Amoco Oil Co., 830 F.2d 476, 484 (3d Cir. 1987)). In addition, "[a]s remedial legislation,
> the Act must be given a liberal construction consistent with its goal of protecting
> franchisees." Humboldt Oil Co. v. Exxon Co., U.S.A., 695 F.2d 386, 389 (9th Cir. 1982)
> (citation omitted).

997 F.2d 641, 643 (9th Cir. 1993). PacWest makes no argument as to the public interest.

PacWest asserts that the factor is inconsequential because this case is merely a private financial

dispute between private parties. The Court agrees with Plaintiffs that, given the legislative

history of the OMFFA and the PMPA, the public interest factor favors Plaintiffs.

   In sum, the remaining three factors favor Plaintiffs. However, it is not enough for

Plaintiffs to prevail on three out of the four factors. In order to carry their burden of persuasion,

Plaintiffs must present a "clear showing" of all four elements. <u>Mazurek</u>, 520 U.S. at 972. A

preliminary injunction is "an extraordinary and drastic remedy" and this Court may not grant

Plaintiffs' motion without a showing of a likelihood of success on the merits. <u>See</u> <u>id.</u>

## CONCLUSION

   Plaintiffs' motion for preliminary injunction [4] is denied because Plaintiffs fail to

demonstrate a likelihood of success on the merits.

   IT IS SO ORDERED.

   Dated this _____ day of _____, 2015.


                         _____
                         MARCO A. HERNÁNDEZ
                         United States District Judge